RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TERRELL LAMAR WILLIAMS,

*Defendant-Appellant*.

No. 25-3426

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:19-cr-00123-1—Benita Y. Pearson, District Judge.

Decided and Filed:  March 13, 2026

Before:  BATCHELDER, THAPAR, and MATHIS, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Michael J. Ledenko, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Akron, Ohio, for Appellant.  Segev Phillips, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

THAPAR, Circuit Judge.  While on supervised release, Terrell Williams defrauded a woman out of $300,000 by falsely claiming that he had been kidnapped and needed ransom money.  He also faked drug tests to hide his ongoing drug use.  And he drove with a suspended license.  As a result, the district court revoked his supervised release and sentenced him to 30 months' imprisonment.  Seeing no error, we affirm.

I.

In 2018, Terrell Williams helped import cocaine into the United States from Venezuela. After law enforcement intercepted a package of drugs mailed to his home, Williams pled guilty to conspiring to distribute cocaine. The district court sentenced him to 21 months of imprisonment—which was below the Sentencing Guidelines range—followed by five years of supervised release.

Williams completed his prison sentence and began his term of supervised release. At first, Williams appeared to be making good progress. He had a stable residence. His drug tests consistently came back negative. And he secured a job at an auto-repair shop. But unfortunately, that appearance of success was nothing more than a mirage.

Several months into Williams's period of supervised release, his probation officer received a disturbing call from the local sheriff's office. An older woman, R.A., reported that Williams had been kidnapped, was being held against his will, and needed money to be released. The probation officer immediately reached out to Williams, who confirmed that he was safe and sound.

A few days later, the probation officer followed up with Williams to investigate the incident. But Williams kept blowing her off. The first time, he claimed to have COVID-19. Then he allegedly had the flu. Finally, over a month later, the probation officer met with Williams at his home. When asked, Williams denied having any text messages with R.A. But that was a lie. After searching Williams's phone, the probation officer discovered multiple text conversations in which Williams told R.A. that he and others had been kidnapped, beaten, starved, and forced to perform various sex acts to survive. He also asked R.A. to send him money so that he could be released. In total, Williams admitted that R.A. had sent him approximately $50,000 to $60,000. He then became agitated about the situation, so the probation officer left for safety reasons.

Nevertheless, the probation officer kept digging into this scheme. She learned that local police had received nine similar reports about R.A. and Williams over the past three years. Each time, R.A. believed that Williams or his family members had been kidnapped and needed money

to be released.  Police, family, and a neighbor tried to convince R.A. that it was a scam, but she was adamant that Williams was telling her the truth.  After all, she had known Williams since he was in kindergarten.  In total, R.A. estimated that she had sent $300,000 to Williams to assist with these supposed kidnappings.

While investigating the fraud, the probation officer also discovered text conversations in which Williams discussed buying marijuana and prescription drugs.  And she learned that while on supervision, Williams had pled guilty in municipal court to driving with a suspended license.  So the district court issued a warrant for Williams's arrest for violating the conditions of his supervised release.

When Williams next reported for a scheduled meeting with his probation officer, he provided a urine sample, which tested negative for any drugs or alcohol.  After the drug test, the U.S. Marshals Service took Williams into custody based on the district court's arrest warrant.  As the marshals were placing him into a holding cell, Williams threw out a bottle filled with urine.  He then admitted to his probation officer that he had purchased a bottle of someone else's urine to fake his drug test.  And he had done the same for his previous drug tests over the past year.  That's because he had been using cocaine, prescription painkillers, and marijuana.  Williams then completed a new drug test, which came back positive for those substances.

Based on all this misconduct, the district court found that Williams had violated the conditions of his supervised release, which required him to follow the law and refrain from using controlled substances.  So it revoked his supervised release and imposed an above-Guidelines sentence of 30 months' imprisonment, to be followed by five more years of supervised release.  The district court also instituted a new supervised-release condition that prohibited Williams from associating with his longtime girlfriend, S.H., who helped him defraud R.A.  Williams timely appealed.

II.

Williams challenges both the length of his sentence and the condition prohibiting him from associating with S.H.  We ordinarily review a sentence imposed following the revocation of supervised release for abuse of discretion.  *United States v. Price*, 901 F.3d 746, 749 (6th Cir.

2018). But when a district court asks a defendant if he has any objections to the sentence and he fails to raise a specific objection, we review that argument for plain error. *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc). To establish plain error, a defendant must demonstrate (1) error (2) that was obvious or clear, (3) that infringed on a substantial right, and (4) that affected the fairness, integrity, or public reputation of the proceedings. *Id.* at 386.

## A.

Williams first argues that the district court erred by seeking to punish him for defrauding R.A. And he contends that the supervised-release statute doesn't permit a district court to punish the conduct underlying a defendant's violation. Williams frames this as a challenge to the substantive reasonableness of his sentence. But considering an impermissible factor at sentencing is a procedural, not substantive, error. *United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019). Because Williams didn't raise this procedural objection below, we review for plain error.

For starters, the record contradicts Williams's argument. Although the district court referenced the seriousness of Williams's fraud scheme, it wasn't seeking to punish him for that conduct. Rather, the district court repeatedly explained that the "facts and circumstances" of Williams's violation illustrated the need for "deterrence and protecting the public," which justified a 30-month sentence. R. 48, Pg. ID 347. And the law explicitly permits a district court to consider both deterrence and protecting the public in fashioning a revocation sentence. *See* 18 U.S.C. § 3583(e); *see also id.* § 3553(a)(2)(B)–(C). So the district court didn't err by weighing those precise factors.

Additionally, even though a district court can't punish a defendant for the conduct underlying his violation, it *can* sanction the defendant's breach of trust associated with the violation. *United States v. Morris*, 71 F.4th 475, 482 (6th Cir. 2023). As a result, a district court may consider the seriousness of a defendant's violation when determining how to sanction that breach of trust.

This remains true even after the Supreme Court's recent holding that district courts can't consider retribution when revoking supervised release. *See United States v. Patterson*, 158 F.4th

700, 703 n.2 (6th Cir. 2025) (citing *Esteras v. United States*, 606 U.S. 185, 194 n.5 (2025)); *see also United States v. Hunter*, No. 25-3069, 2025 WL 3731056, at *3–5 (6th Cir. Dec. 26, 2025) (Thapar, J., concurring in the judgment).  That's because breach of trust isn't about retribution or punishment.  Instead, it concerns the "forward-looking relationship" between the defendant and district court "that's focused on helping him reintegrate into society."  *Hunter*, 2025 WL 3731056, at *3 (Thapar, J., concurring in the judgment).  After all, district courts and probation officers rely on a relationship of trust with defendants to assist their return to the community. *See United States v. Johnson*, 529 U.S. 53, 59 (2000).  And when a defendant violates his supervised-release conditions, he breaches that trust.  *Hunter*, 2025 WL 3731056, at *5 (Thapar, J., concurring in the judgment).  So a district court often must account for the seriousness of the breach when determining how to rebuild the relationship of trust and set the defendant back on a path to rehabilitation.

What's more, a defendant's breach of trust directly relates to several factors that the supervised-release statute permits a district court to weigh when imposing a revocation sentence. *See* 18 U.S.C. § 3583(e); *id.* § 3553(a)(1), (2)(B)–(C).  For example, we have long considered breach of trust as a component of a defendant's history and characteristics.  *United States v. Johnson*, 640 F.3d 195, 207 (6th Cir. 2011).  And a defendant's breach of trust by returning to illegal conduct demonstrates the need to deter him from breaking the law and to protect the public from him. *See United States v. Blackman*, No. 24-5517, 2025 WL 1262322, at *3 (6th Cir. May 1, 2025).  In short, a district court may consider the severity of a defendant's breach of trust in imposing a revocation sentence.

Williams's conduct here amounted to a substantial breach of the district court's trust. When Williams was originally sentenced for conspiring to distribute cocaine, he claimed to be "very ashamed of [his] actions" and "willing to take responsibility for what [he had] done." R. 14, Pg. ID 81.  He asked the district court "for a lighter sentence to prove . . . that [he could] be a law-abiding citizen."  *Id.*  He "promise[d]" the court that he wouldn't "mess up"—and, if he did, the court could "give [him] a harsher punishment."  *Id.*  But Williams didn't keep those promises.

Instead, he repeatedly violated the conditions of his supervised release.  Williams carried out a multi-year scheme to defraud R.A. out of hundreds of thousands of dollars.  When confronted about this scheme, he lied to his probation officer.  Both the fraud and lies were part of a broader pattern of noncompliance.  Williams also regularly used drugs while on supervised release and deceived his probation officer by faking his drug tests.  Finally, he violated state law by driving with a suspended license.

At Williams's revocation hearing, the district court recognized these severe breaches of trust.  The district court noted that Williams "evade[d] drug treatment," refused to do honest work, stole money, and "cheat[ed] and lie[d]."  R. 48, Pg. ID 333.  And the district court connected these breaches of trust to the relevant sentencing factors, namely "the danger [Williams] posed to society" and "the need to deter [him] and protect society from further crimes [he] would commit."  *Id.*  The district court didn't err by considering the seriousness of Williams's violation conduct.

B.

Williams also contends that the district court placed too much weight on the seriousness of his violation conduct, resulting in an unreasonably long sentence.  That's a challenge to the substantive reasonableness of his sentence, which we review for abuse of discretion.

A sentence is substantively reasonable if it is "sufficient but not greater than necessary, to comply with the purposes of" sentencing.  *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (quotation omitted).  But a district court's weighing of the sentencing factors is a discretionary decision, not a mathematical formula.  *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).  So our job on appeal isn't to reweigh those factors.  *United States v. Houston*, 529 F.3d 743, 756 (6th Cir. 2008).  Rather, our review must be highly deferential.

Applying that deference, we conclude that Williams's sentence was substantively reasonable.  The district court carefully weighed the sentencing factors and concluded that a 30-month sentence was necessary "to deter" Williams and "protect society from further crimes" he might commit.  R. 48, Pg. ID 333.  In reaching this conclusion, the district court didn't put too much weight on the seriousness of his violation conduct.  That's because the seriousness of

Williams's conduct demonstrated the pressing need to protect the public from similar scams. Incapacitating Williams was especially important to protect R.A., who continued to believe that he was telling her the truth about his supposed kidnappings.

Likewise, the district court's sentence was justified by the fact that Williams had received a below-Guidelines sentence for his original drug conviction. That leniency reflected the trust the district court had placed in Williams to lead a law-abiding life upon his release. *See United States v. Mickel*, No. 24-1247, 2025 WL 263390, at *2 (6th Cir. Jan. 22, 2025). Williams's violation of that trust supported the district court's decision to vary upward for his revocation sentence. *See id.* Thus, the district court didn't abuse its discretion in sentencing Williams to 30 months' imprisonment.

C.

Finally, Williams challenges the supervised-release condition that prohibits him from communicating with his longtime girlfriend, S.H. He argues that this condition infringes on his fundamental constitutional right to marriage. At sentencing, Williams objected to this condition, so we review for abuse of discretion.

A district court may impose a supervised-release condition if it (1) "is reasonably related" to the sentencing factors, (2) doesn't involve a "greater deprivation of liberty than is reasonably necessary" to comply with those factors, and (3) "is consistent with any pertinent policy statements of the Sentencing Commission." *United States v. Nixon*, 664 F.3d 624, 627 (6th Cir. 2011). When a special condition limits a fundamental right safeguarded by the Constitution, that restriction must also be directly related to rehabilitating the defendant and protecting the public. *United States v. Kingsley*, 241 F.3d 828, 839 n.15 (6th Cir. 2001). Williams argues that the supervised-release condition restricting his contact with S.H. ran afoul of these standards because it effectively prohibited him from marrying S.H. and thus unreasonably burdened his constitutional right to marriage.

But the district court didn't abuse its discretion in restricting Williams's communication with S.H. That's because this supervised-release condition directly related to protecting the public from Williams. First, S.H. was a "coequal" in Williams's efforts to defraud R.A. R. 48,

Pg. ID 338.  She played a key role in "encouraging R.A. to believe that Mr. Williams or someone else was in peril, had been beaten, tortured[,] or kidnapped."  *Id*. at 350.  So restricting Williams's communication with S.H. would reasonably prevent the two from conspiring in the future to defraud R.A. or others.  Additionally, Williams repeatedly sent S.H. text messages in which he threatened, "I'm gonna slit your [f******] throat. . . . I really want to come up there and cut your [f******] throat now.  If I could figure out a way to get away with killing you, I swear I would."  *Id.* at 351; *see also id.* ("I just keep thinking about slicing your throat, then my own. . . . I need to get far away from you before I do something.").  As a result, the supervised-release condition also protected S.H. by prohibiting Williams from harassing her, threatening her, or carrying out his threats to kill her.

In similar circumstances, we've upheld special conditions that barred defendants from communicating with their romantic partners.[1]  *See United States v. Faber*, 718 F. App'x 349, 351–52 (6th Cir. 2017) (collecting cases).  For example, we affirmed a special condition that barred a defendant from associating with her fiancé because she had led the police on a high-speed chase to protect her fiancé from arrest.  *United States v. Bortels*, 962 F.2d 558, 559 (6th Cir. 1992) (per curiam).  The same concern for public safety that we recognized in *Bortels* applies here given S.H.'s efforts to facilitate Williams's fraud scheme.  *See id.*  Likewise, we've twice affirmed special conditions that forbade defendants from living with women, including their romantic partners, because of the defendants' history of domestic violence.  *United States v. Brandenburg*, 157 F. App'x 875, 879–80 (6th Cir. 2005); *United States v. Horn*, No. 25-3147, 2025 WL 3070315, at *3–4 (6th Cir. Nov. 3, 2025).  Williams's repeated threats to kill S.H. similarly justify a restriction on his contact with her.

What's more, the special condition might not even infringe upon Williams's asserted constitutional right to marriage.  That's because Williams may seek permission from his probation officer to communicate with S.H.  *See United States v. Shultz*, 733 F.3d 616, 623 (6th Cir. 2013).  Plus, as the district court recognized, Williams may request to modify or remove the condition if he marries S.H. while he is in prison or if his relationship with her otherwise

---

[1]In these cases, the defendants argued that the special conditions infringed their right of association.  But the reasoning underlying our decisions to uphold those conditions applies with equal force to Williams's challenge.

changes. *See* 18 U.S.C. § 3583(e)(2); *United States v. Arnold*, 549 F. App'x 491, 498 (6th Cir. 2013). In short, the district court didn't abuse its discretion in imposing a supervised-release condition that restricted Williams's communication with S.H.

\* \* \*

We affirm.